Milton F. ROSENTHAL, as Trustee of the LeBlanc Corporation, et al.,

v.

The GUARANTY BANK AND TRUST COMPANY OF LAFAYETTE, LOUISIANA.

No. 4078.

United States District Court
W. D. Louisiana, Opelousas Division.

March 14, 1956.

Cahill, Gordon, Zachry & Reindel, New York City, Montgomery, Barnett, Brown & Sessions, New Orleans, La., Bailey & Mouton, Lafayette, La., for the Trustee.

Mouton & Mouton, Lafayette, La., for defendant.

HUNTER, District Judge.

The Trustee in Bankruptcy of the LeBlanc Corporation, of Louisiana, and of its parent corporation, the LeBlanc Corporation, of Maryland, herein referred to, respectively, for purposes of brevity, as the Louisiana Company and the Maryland Company, seeks to recover from the Guaranty Bank and Trust Company of Lafayette, Louisiana, the sum of $6,699.91, with interest, representing checks of the Louisiana Company drawn on its account with defendant and honored by the latter between October 4 and 10, 1951, both dates inclusive.

The case having been tried to the Court, the following are made Findings of Fact:

(1) Plaintiff, Milton F. Rosenthal, is a citizen of the State of New York, appointed on October 5, 1951, by order of the United States District Court for the Southern District of New York, as Trustee in proceedings for the re-organization of the LeBlance Corporation, a Louisiana corporation, and the LeBlanc Corporation, a Maryland corporation; he was duly qualified and promptly entered upon the discharge of his duties as Trustee, and has since been and is still acting as Trustee.

(2) Defendant, Guaranty Bank and Trust Company, Lafayette, Louisiana, is a banking corporation organized under and pursuant to the state banking laws of the State of Louisiana, with its place of business in the City and Parish of Lafayette, State of Louisiana.

(3) The Louisiana company had on deposit with defendant bank at the close of its business on October 3, 1951, an amount in excess of $6,699.91.

(4) The defendant bank cashed checks of the Louisiana company totaling $6,699.91 between October 4 and 10, 1951, both dates inclusive.

(5) Each and everyone of the checks were issued by the Louisiana company

prior to the bankruptcy proceedings of October 3, 1951.

(6) The Maryland company and the Louisiana company each filed petitions for re-organization under Chapter 10 of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., in the United States District Court for the Southern District of New York on October 3, 1951. The petition of the Louisiana company was filed at 1:12 P.M. (E.S.T.). The order approving the Louisiana company's petition was signed the same day at 4:20 P.M. (E.S.T.), which is 3:20 P.M. (C.S.T.).

(7) On June 7, 1954, the New York court rendered its order adjudging both corporations bankrupt and directing that bankruptcy be proceeded with pursuant to the provisions of the Bankruptcy Act.

(8) The Louisiana company carried approximately 95% of its banking business with defendant and "Hadacol" was a million-dollar enterprise, nationally known and advertised with its center of activity at Lafayette, Louisiana, where the corporation had one of the largest payrolls.

(9) On October 3, 1951, the imminent collapse of the "Hadacol" enterprise was publicized with banner headlines in the Lafayette Advertiser, a daily newspaper having a wide circulation in the City of Lafayette, and further accounts were given of proceedings in connection therewith in issues of the same newspaper on October 4th and 5th, as well as the issues of the New Orleans States and the New Orleans Times-Picayune on October 3, 4 and 5, 1951.

(10) Defendant bank was a subscriber to the Lafayette Advertiser prior to and on October 3, 4 and 5, 1951, and the bank received the issues of that newspaper on those specific dates.

(11) R. J. Castille, President of the defendant bank, and George Arceneaux, Cashier, were both individual subscribers to the paper. The bank officials, other than R. J. Castille, President of the bank (who was out of town at the time), read of the bankruptcy proceedings in the Lafayette paper on October 3rd and the officers who were present in the bank on that day discussed the situation.

(12) It was not shown that any of the bank officials read the articles appearing in the New Orleans papers under dates of October 3, 4 and 5, 1951. The article appearing in the Lafayette Advertiser of October 3, 1951, referred to The LeBlanc Corporation of Maryland holding company for the LeBlanc Corporation of Louisiana. Nowhere in that article is any reference made to any re-organization proceedings having been filed by the LeBlanc Corporation of Louisiana.

(13) The article appearing in the issue of the Lafayette Advertiser of date October 4, 1951, makes reference to a petition filed for re-organization and a complaint of false advertising by said corporation filed by the Federal Trade Commission. On Page 4 of said newspaper, the reference is to the bankruptcy proceedings by the LeBlanc Corporation of Maryland. No mention is made therein of the LeBlanc Corporation of Louisiana.

(14) The last article appearing in the Lafayette Advertiser on October 5, 1951, reads as follows:

"New York, Oct. 5, A.P. A hearing on the Hadacol patent medicine company's petition for reorganization under the Bankruptcy Act was set for November 9th.

"Federal Judge William Bondy named the hearing date yesterday after the company filed the petition listing liabilities of $4,200,000 and and assets of $2,600,000."

(15) Sometime between October 6 and October 10, 1951, Mr. Carl R. Lowe, a Lafayette representative of the Louisiana company, called Mr. Arceneaux, Cashier for the defendant bank, and told him that The LeBlanc Corporation was under reorganization and suggested that payments be stopped on the checks that had been previously issued. Mr. Arceneaux informed Mr. Lowe that it was not the custom of the bank to stop payment on any check unless a description of the

check was given the bank, and he suggested to Mr. Lowe that the bank be furnished with a detailed description of the checks so that they would know which ones they were not to pay.

(16) The bank had had previous dealings with Lowe and had reason to be skeptical of Mr. Lowe's authority and advice. Mr. Lowe had previously given and countermanded orders in connection with the bank account to such an extent as to cause confusion to the bank. No attempt was made to secure the testimony of Mr. Lowe by appearance as a witness or by deposition.

(17) Mr. Castille was at a bankers' convention in Chicago on October 3, 4 and 5, 1951, but returned to Lafayette on October 6, 1951, and on that date he visited the bank and discussed with the bank's attorneys in detail the question of honoring checks on the Louisiana company's account.

(18) The officials of the bank decided to continue to honor checks until they ascertained the true status of the Louisiana company.

(19) Milton F. Rosenthal, Trustee in reorganization for the Louisiana company, by letter dated October 9, 1951, which was received by the bank on October 11, 1951, notified the bank of the bankruptcy proceedings. Payment of all checks on the account was stopped on the receipt of that notice, and the Trustee was so advised by letter on that same date.

(20) During the period from October 2nd through October 10, 1951, the status of the LeBlanc Corporation was very much confused. No one locally knew just what was happening.

(21) Officials of the defendant bank did not have "actual knowledge" of the pending bankruptcy proceedings for the Louisiana company within the meaning of the bankruptcy law. The bank officials acted in good faith and in the regular course of business in honoring the checks, which were issued prior to October 3rd.

## The Law

The suit is based on Title 11 U.S.C.A. § 110, which provides that the Trustee is "vested by operation of law with the title of the bankrupt as of the date of the filing of the petition." Necessarily, any transfer of the bankrupt's bank account after the filing of the petition and adjudication would violate that rule. Defendant recognizes this, but maintains that it had no "actual knowledge" of the bankruptcy proceeding and acted in good faith when the checks were cashed. This raises a factual question, for the Trustee takes the position that as of the close of business on October 3, 1951 and thereafter, the defendant was fully aware of the pending proceedings in New York and cashed the checks in question with actual knowledge that the bankruptcy petitions had been filed.

Going a step further, the Trustee asserts with confidence and argues with conviction that since the amendment of the bankruptcy statute by the Chandler Act (effective September 22, 1938) that a bank is liable regardless of knowledge or good faith where it cashes checks of the bankrupt after the order approving a petition for reorganization was actually signed. The amendments affected by the Chandler Act relied on are as follows:

"Title 11 U.S.C.A. § 110:

"(d) After bankruptcy and either *before adjudication* or before a receiver takes possession of the property of the bankrupt, whichever first occurs—

\*　　\*　　\*　　\*　　\*　　\*

"(2) A person indebted to the bankrupt or holding property of the bankrupt may, if acting in *good faith*, pay such indebtedness or deliver such property, or any part thereof, to the bankrupt or upon his order, with the same effect as if the bankruptcy were not pending;

"(3) A person having *actual knowledge* of such pending bankruptcy shall be deemed not to act in

good faith unless he has reasonable cause to believe that the petition in bankruptcy is not well founded;

\*   \*   \*   \*   \*   \*

"(5) A person asserting the validity of a transfer under this subdivision shall have the burden of proof. Except as *otherwise provided in this subdivision and in subdivision g of section 44 of this title, no transfer by or in behalf of the bankrupt after the date of bankruptcy shall be valid against the trustee: provided, however, That nothing in this title shall impair the negotiability of currency or negotiable instruments.*" (Emphasis ours.)

The Trustee particularly directs the Court's attention to Subparagraph (5) of Title 11 U.S.C.A. § 110, subdivision d, which he says plainly and expressly states that except as provided in subdivision d and in subdivision g of Section 44 (which latter subdivision relates to real estate and has no bearing here), no other transfer after the date of the bankruptcy shall be valid against the Trustee, and of course, he argues, the only exceptions stated in subdivision d are that the payments must be made both before adjudication and without notice of the pending proceedings.

This argument is not without merit and were it not for the fact that there is appended to that Section the proviso "that nothing in this title shall impair the negotiability of currency or negotiable instruments", we would be inclined to agree. Since no court decision has been called to our attention and none have been found interpreting the meaning or purpose of this provision, the matter must be considered res integra. When the bankruptcy occurs the bank upon which the bankrupt drew a check prior to the date of the bankruptcy finds himself caught in the intermeshing of two highly complicated systems of law. Traditionally, it is the primary function of the Bankruptcy Act to protect the creditors, to marshal the assets, and to distribute them among the creditors equitably and ratably in accordance with their respective rights and interests. Negotiability tries to give the bank the maximum assurance that it will be able to cash the check without any defenses being interposed. An expansion of bankruptcy in some senses indisputably hinders the flow of commercial paper. In the absence of any prior interpretation, we agree with counsel for defendants that one of the purposes of the "negotiability" provision in the Bankruptcy Act was to protect a bank in a case of this kind, if the bank was in good faith and had no "actual knowledge" of the pending bankruptcy.

Accordingly, insofar as the instant case is concerned, there is no appreciable difference in the act now and as it stood prior to the Chandler Amendment, and before the amendment it was recognized that a bank could escape liability when in good faith and without actual knowledge of the pending proceedings it honors the bankrupt's checks in the regular course of its business. Stevens v. Bank of Manhattan Trust Co., D.C., 11 F.Supp. 409; Collection of cases Citizens' Union Nat. Bank, 6 Cir., 286 F. 527, in 31 A. L.R. 256 and Cunningham v. Lexington Trust Co., 259 Mass. 181, 156 N.E. 1, 54 A.L.R. 751.

The "good faith" of the bank is not assailed by the plaintiff in its petition or in its brief. A careful consideration of all the facts and circumstances surrounding the payment of the checks in question by the bank clearly show that its action in so doing was in the utmost of good faith. The checks were all issued to local residents prior to the date of the filing of the petition in New York, and while the evidence is not full or detailed, it warrants the conclusion that the great majority of the checks were issued by the Louisiana company to meet a current payroll of the bankrupt. Obviously, the bank had nothing to gain by cashing the checks. It is argued, however, that a conclusion of bad faith is compelled because the Chandler Act specifically says that "*a person having actual knowledge*

of such pending bankruptcy shall be deemed not to act in good faith unless he has reasonable cause to believe that the petition in bankruptcy is not well founded." Thus, we have presented the question of "actual knowledge". Once again a careful examination reveals no cases, and none have been cited interpreting the phrase "actual knowledge" as used above in Title 11 U.S.C.A. § 110, sub. d(3). However, the identical term "actual knowledge" is used in Title 11 U.S.C.A. § 35, which provides in pertinent part:

"(a) A discharge in bankruptcy shall release a bankrupt from all his provable debts, whether allowable in full or in part, except such as

\* \* \* \* \* \*

"(3) \* \* \* have not been duly scheduled in time for proof and allowance, with the name of the creditor, \* \* \* unless such creditor had *notice or actual knowledge of the proceedings in bankruptcy.*" (Emphasis mine.)

Since both Section 110 and Section 35 employ the identical term, there would be no reason why "actual knowledge" under Section 110 should vary in meaning from "actual knowledge" under Section 35. But, a study of the cases interpreting the term as used in Section 35 reveals only that the question of "actual knowledge" is a question of fact to be determined by the Court. In the instant case, the bank's directors knew something was going on in connection with the various LeBlanc Corporations, but they did not have "actual knowledge" of what was going on, and they did not know exactly what until they were notified on October 11, 1951.

It is generally recognized that newspaper articles regarding sensational matters such as the bankruptcy of a million-dollar concern are by no means complete and are not always accurate. Cases should not be tried in the newspapers. The Lafayette newspaper articles only referred to the Maryland corporation with no reference to a similar petition having been filed by the Louisiana corporation. Something was brewing but no one in Lafayette new what. In fact, the very article relied on so strongly by the Trustee (Lafayette Advertiser of October 3, 1951) contains this notation:

"General Manager, Richard L. Brown, is attending the New York meeting and consequently no authoritative spokesman for the firm is available for comment on the latest local developments."

Under the then existing conditions, it was logical for the bank to continue honoring these checks drawn on it. If the bank had failed to honor the checks presented in the ordinary course of business and the bankruptcy had not been a fact, then and in that case the bank would have been subject to damage suits.

### Plea of Estoppel

Defendant has filed a plea of equitable estoppel and argues that since the bankruptcy was in New York, and plaintiff knew that the bankrupt had its largest checking account in the defendant bank in Lafayette, Louisiana, it should have given defendant notice, and failure to speak under the circumstances mislead the defendant in taking action to its detriment. It is argued that the checking account with the defendant bank constituted an order by the Louisiana corporation to the bank to honor and pay checks issued by it from the funds on deposit, and accordingly, the Trustee, immediately upon his appointment, should have given notice to the bank to stop payments, and that his failure to so do is the cause of all the trouble.

It is apparent to us that the preparation of the petition for reorganization in a business of the magnitude of the LeBlanc Corporation must have consumed considerable time, and that the attorneys and officers of the corporation, in preparation of said proceedings, were cognizant of its major checking account being in Louisiana. However, because of the Court's holding to the effect that the bank is not liable, there is no necessity of passing upon the plea of estoppel.

## Conclusions of Law

(1) The jurisdiction of the Court in this action is conferred by the Bankruptcy Act, and more particularly by Sections 23 and 102 thereof, and Section 1332 of the United States Judicial Code.

(2) The Trustee of the estate of a bankrupt is vested with title of the bankrupt as of date of filing of petition initiating the proceeding. Title 11 U.S.C.A. § 110.

(3) The changeover from reorganization proceedings to regular bankruptcy is of no legal importance here because under the express provisions of the Bankruptcy Act, the rules applicable to ordinary bankruptcy proceedings insofar as the subject matter of the case is concerned, are made applicable to reorganization proceedings, and the date of adjudication shall be taken to be the date of approval of the petition for reorganization. Title 11 U.S.C.A. §§ 502 and 638.

(4) Title 11 U.S.C.A. § 110, sub. d, which is decisive of the issue involved, reads as follows:

"(d) After bankruptcy and either before adjudication or before a receiver takes possession of the property of the bankrupt, whichever first occurs—

"(1) A transfer of any of the property of the bankrupt, other than real estate, made to a person acting in good faith shall be valid against the trustee if made for a present fair equivalent value or, if not made for a present fair equivalent value, then to the extent of the present consideration actually paid therefor, for which amount the transferee shall have a lien upon the property so transferred;

"(2) A person indebted to the bankrupt or holding property of the bankrupt may, if acting in good faith, pay such indebtedness or deliver such property, or any part thereof, to the bankrupt or upon his order, with the same effect as if the bankruptcy were not pending;

"(3) A person having actual knowledge of such pending bankruptcy shall be deemed not to act in good faith unless he has reasonable cause to believe that the petition in bankruptcy is not well founded;

"(4) The provisions of paragraphs (1) and (2) of this subdivision shall not apply where a receiver or trustee appointed by a United States or State court is in possession of all or the greater portion of the non-exempt property of the bankrupt;

"(5) A person asserting the validity of a transfer under this subdivision shall have the burden of proof. Except as otherwise provided in this subdivision and in subdivision g of section 44 of this title, no transfer by or in behalf of the bankrupt after the date of bankruptcy shall be valid against the trustee: *Provided, however, That nothing in this title shall impair the negotiability of currency or negotiable instruments."* (Emphasis mine.)

■ (5) One of the purposes of the negotiability clause as it appears in subparagraph (5) of subdivision d, Section 110, Title 11 U.S.C.A., is to protect banks who in good faith, for present equivalent value, in the usual course of their business, and without actual knowledge of the bankruptcy, honors checks drawn on it by the bankrupt and especially is this true when, as here, the checks were drawn before the filing of the petition[1].

■ (6) A bank is not liable when in good faith and without actual knowledge of the bankruptcy it honors the bankrupt's checks in the regular course of its business, and especially is this true when the checks were drawn prior to the filing of the bankruptcy. Title 11 U.S.C.A. § 110, sub. d; Stevens v. Bank of Manhat-

---

[1] It could be argued that the giving of the check and not payment thereon should constitute the governing date.

tan Trust Co., D.C.S.D.N.Y., 11 F.Supp. 409, involving a case prior to the Chandler Act.

■ (7) A person having "actual knowledge" of the pending bankruptcy cannot be in good faith. The question of what constitutes "actual knowledge" is a question of fact to be determined by the circumstances of each case.

(8) The question of what constitutes *"actual knowledge"* within the meaning of 11 U.S.C.A. § 110, sub. d(3) is a question of fact to be determined by the circumstances of each case.

### Conclusion

For the above and foregoing reasons, the Court is of the opinion that there should be judgment for the defendant. Counsel for defendant will prepare a proposed judgment, serve a copy thereof upon counsel for Trustee, and submit same to the Court for its approval.